Good morning. My name is Howard Davis. I'm a police of court. Can you speak up a little bit, please? Okay. Thank you. I'm representing the petitioner, Liana Mardoyan, and her husband, Sonville. Hopefully, I'll be able to have about two minutes for rebuttal. I guess I'll watch the clock. In this case here, looking to the language of HCFR 1208.13b.3.2, there is no substantial evidence to support the conclusion that the DHS showed by a preponderance of the evidence that it was reasonable under all circumstances for Liana Mardoyan to relocate elsewhere in Armenia. And in this case here, the board, I believe, misapplied the law and missed some important points in the record that would actually speak to something favorable. Why didn't the BIA cure that when it found that the government had indeed met its burden? I'm sorry, Your Honor? Why didn't the BIA cure that when it found that the DHS had indeed met its burden? Well, first of all, one of the things that I think is of concern in it is in the opening part here, where it says, and I'm looking to the board's decision, and I'm referring to page 245 of the administrative record. It says, as the immigration judge noted, the evidence of record, particularly the lead respondent's answers to the DHS's questions on cross-examination, does not support the lead respondent's claim that her persecutors can exert their influence outside of Gyumri, the city where the petitioners live. And first of all, one of the things that bothers me about that statement is that that's not necessarily what's required here. I mean, first of all, there are two subsections in which you can look at for discretionary considerations. One is changed circumstances, which was not at issue here, and the other is, you know, reasonable relocation. And that's what's here. And so when you look at this, when you look at the list in 1208.13B, it doesn't say that the people who are giving you problems in one area have to give you problems in another area. Mr. Davis, in Cardenas, for example, we reviewed a country report as a very similar situation. Usually in the country reports produced by the State Department, if there's a serious problem in various areas of a particular country, they usually call that out. There's nothing like that with Armenia in the country report. In the record, it's very clear that this woman's sons are still there. There's been no effort, apparently, to try to do any harm to them. They contacted the sister. But it's really just the local officials. There's nothing on a national basis that was substantiated at the BIA or at the IJ. What are we missing here? Where is any evidence? The government has shown by the country report that there is no problem elsewhere. Where is there evidence in the record that suggests that if this woman were to relocate elsewhere in Armenia, that she would have a difficulty? Well, okay, first of all, in this type of situation, under the reasonableness of internal relocation, again, it's not required that the particular people who are giving her problems in Gyumri give her problems in other areas. She did say that there would be problems, first of all, if you look at page 145 of the administrative record. The judge, for example, in the judge's question, is asking the question, and I'll refer you to line 15. It says, but if you were in another area, why would you even have to speak out against them? And then she talks about that she'll go back to the area, and then problems will begin all over again, because these problems happen in other areas, and she will feel the need to speak out, which is somewhat similar to the petitioner in Mamoun's hand. So what you're saying is that your client wants to speak out about issues that she feels strongly about wherever she goes, and that therefore the United States has to take that as basically permission for her to remain here because she decides that she's going to create an issue wherever she goes. Is that the idea? Well, but the thing is, is that, yes, I mean, that's part of her rights. I mean, for example, in Mamounian itself, it says that were Mamounian to refrain from political protests in the future, she very well might be able to escape future persecution. However, just as we don't require a petitioner to convert to the government-supported religion to avoid persecution, we don't require renunciation of anti-government political views. What you're saying is that anyone who wants to come to the United States and claim asylum could say, if I went back to my country, I'm going to create a lot of problems wherever I go, and I'm going to get in a lot of trouble, and therefore you've got to let me stay in the United States? Well, and I think that the Court's concern here is, well, it's the slippery slope, and you want to know where it ends. It's more than that. But the thing is, is that in the past, I mean, it's not like she's just making up, well, I'm going to create problems wherever I go. But she and the Court found that she had past persecution on account of her speaking out. So I think that you have to look at the totality of the record of the circumstances, including what has been done in the past in connection with the country records, and that will provide your limits as to this sort of claim. What other things are in the record that go to whether the DHS met its burden of showing that there was reasonable internal relocation? Well, there's one thing that, you know, for example, you know, that Judge Smith brought up, is that that has to do with this whole thing about, you know, ask, you know, about the children and all that. I mean, that was one of the things that was mentioned. Now, what Ms. Mardoyan said is that she connected whatever risk, problems, dangers that the children had to her presence, and it's that she's not around that decreases the risk of harm to them. Okay. And so she says that. So she left. Are there impediments to her relocating in Armenia? Well, and then so that's another thing, is that in the State Department reports. Now, I mean, for example, in 184 of the record, it does – it's not an absolute certainty that she is going to be able to relocate because it's – because the government still has some restrictions on movement. And, I mean, although it says that this practice is now more of a nuisance from impediment, et cetera, but there's still some holdovers from the old Propiska system that was under the Soviets. The other thing is, is that they do mention, again, on page 176, that there's a lot of – that there's women form a disproportionately large number of the unemployed and that there's some form of employment discrimination or men dominate. So this is another thing that prevents her from being able to go elsewhere. And in addition to the fact that, you know, and as the Mimousian Court pointed out, and as in the administrative record, that there is a – you know, there's a lot of human rights abuses and there's a lot of corruption. And the Mimousian Court recognized that. And I see I only have less than a minute. I better stop. Well, I just have a question. She talks about she received a reprimand in writing in the Book of Employment. How would that affect her ability to relocate, if at all? Well, I think that if this is something that she would have to present when she's looking for a job, they would see that she has a history of being a, quote, unquote, troublemaker that might make it difficult. What's the Book of Employment? Well, it's a book that they have where – it's a government-issued book in which they list the various employments that you've had. So it's sort of like a history. I've seen it in other cases as well. Okay. May it please the Court, my name is Luis Perez, and I represent the Attorney General in this matter. Your Honors, the Department of Homeland Security did meet its burden of proof of establishing that in this particular case, internal relocation is both safe and reasonable. Well, you know, I don't see any analysis of the BIA that individualizes the country conditions to her. The BIA actually – So for that failure alone, shouldn't there simply be a remand? No, Your Honor, because actually in this case, I would argue that the BIA did more than that. The BIA went directly to Ms. Mardoian's testimony. And based on her testimony, found that the fact that her children, who were the object of the – So of course her kids are going to be okay. I mean, I don't know where the kids are, and she's not there mouthing off about whatever in order to get the authorities mad at her and then again at her kids. But the record also shows that the kids are staying with acquaintances when they could be staying with relatives in Gyumri. If the problem is the fact that she is present in Gyumri, and that's what creates the danger to her kids, then the kids could stay with the sister-in-law and not with acquaintances in Gyumri. And remember – That's an interesting observation. However, it certainly isn't set forth in the BIA's analysis. Well, Your Honor, the BIA – It's pure speculation on your part, isn't it? Actually, no, Your Honor. The BIA doesn't have to write an exegesis out of every claim. Well, what the BIA needs to do – First of all, do you agree that the IJ improperly applied the burden of proof? No, Your Honor. I would say that the language in the IJ's decision lacks clarity. And the BIA did correct that by setting forth clearly the standard. No, I know. I'm asking about the IJ. I know what the BIA attempted to do. I would argue that the IJ, on page 155 of the administrative record, did know that DHS met its burden of proof. But once the – that's on the last sentence, the sentence that starts with, however, unfortunately, I also agree with the service in their statement that there was no real evidence indicating that she was – But if there's no evidence, though, I mean, in order to meet a burden of proof, you need to put forth some evidence. In this case, it has to be a preponderance of the evidence. And if there's no evidence, that means nobody put forth a preponderance of the evidence to prove it one way or the other. It's a burden of proof, not a burden of production. The DHS doesn't have to affirmatively – In order to meet your burden of proof, you need to put forth something. Well, it's not a burden of production. It could be minimal, but it's got to be something. The government's contention is that the DHS can reasonably rely on Ms. Martoyan's testimony to rebut the burden of – to rebut the presumption of the well-founded fear of future persecution. It's part of the evidence in the record. Because it's a burden of proof, not a burden of production. Mr. Perez, why is our decision in this case not mandated by the Lim decision that we decided in 2000? As you recall, that case involved – was found that relocating children, the persecutor's failure to contact the applicant over a long period of time, and the country report were insufficient to rebut a presumption of a well-founded fear of persecution. Well, first, in this case, the children were the object of threat, so the fact that they – While she was there. While she was there. But again, it goes to show that the children are probably safe, not because she's not there, but because they are outside of the locality. And also, in this case, not only you have evidence in the record that shows – I'm sorry, in the State Department report that shows that local officials' authority is limited to the localities. That's on – I think I cited that in my opening brief. It's on page 186 of the administrative record. But you also have the evidence of her own testimony that suggests that the mayor's and Mr. Vardayan's authority doesn't extend beyond those – the boundaries of the city of Umbri. And to that extent, she would be safe outside of that city. And based on that testimony, and based on what the Department of – the State Department shows, DHS did meet this burden of proof. And remember, the issue for purposes of the standard review of the court is whether the record compels the contrary conclusion, that DHS did not meet this burden of proof, relying on her own testimony, Ms. Vardayan's own testimony, and the evidence in the record. Now, I would like to respond to Mr. Howard's allusions to the case of Mammuzian. In Mammuzian, the issue was not internal relocation. The court found that Mammuzian established a well-founded fear of future persecution, and that if she goes back to the place where she was actually persecuted, she may not be persecuted if she didn't engage in political activities. But the court didn't expect her to reframe herself from doing so. In this case, we're talking about internal relocation. Ms. Vardayan would not be going back to the place, to Gyumri, the place where she did suffer persecution. She would relocate to another area where the Department of Homeland Security did establish that it would be safe and reasonable. Also, the claim that was presented to the board was not a claim where Ms. Vardayan affirmatively stated to the board, if I go to another area of Armenia, I would engage in that type of activity. Her claim before the board is the board didn't meet its burden of proof because the government officials at the national level will protect these local officials and will continue to persecute me. In his reply brief, Mr. Howard points to the fact that the brief is pro se, and that should be construed liberally. But in this case, Your Honor, Ms. Vardayan filed a 26-page brief with citations to the record with us. It essentially is the type of brief that would put to shame briefs filed by counsel in the Board of Immigration Appeals. Finally, Your Honor, with respect to Ms. Vardayan's claim of the Convention Against Torture, I would note that the alien in Mammouzian did suffer considerably more severe persecution than Ms. Vardayan in this case. And in Mammouzian, the court found that although that constituted persecution, that certainly didn't rise to the level of what the Torture Convention compounds. So it doesn't constitute past torture, as the board found. And I would move the court to affirm the BIA's decision. Counsel, before you sit down, Judge Reimer asked a question about a failure on the part of the government to particularize where you think she's going to go in Armenia. What's your response to that? Again, the government has the burden of proof here. Why didn't they do anything on that? What is your response? My response is that once DHS meets its burden of proof, the burden goes to the fact. But this is part of the burden of proof, is it not? The burden of proof goes to the fact it's based on the actual past persecution claim. Her past persecution claim was I was persecuted by these local officials, and these local officials will continue to persecute me. On the basis of that past persecution claim, DHS demonstrated that. . . The national authorities covered for them. But that is. . . And would continue to. That is her belief. But that belief is not substantiated by the record. That's her testimony. And I guess my problem with this, and I might as well throw it out, is that while the BIA did ostensibly shift the burden of proof to the DHS in this discussion, it never expressly analyzed her contention or the reasons that she put forth, including the reprimand in the Book of Employment, why relocation was not a reasonable possibility for her. In terms of the reprimand that goes to her ability to obtain employment, that was not something that she raised before the Board of Immigration Appeals. Her claim before the Board was limited to the fact that this, the mayor and Mr. Bardigan, had influence at the national level, and that they will continue to persecute her regardless where she goes. But the State Department report sort of rebuts that by saying that on page 186, that local elected officials have limited powers. And again, the fact that these local officials simply inquire on her sister-in-law, where she was, and didn't pressure her for an answer, and it was limited to inquiries, as the Board clearly found, also suggests that these people either have no interest in her or are unable to do more than simply inquire her sister-in-law about her whereabouts. Okay. Thank you for your argument. Thank you. Thank you, Mr. Davis. You did a good job to rehabilitate the DIA. Thank you. Mr. Davis. Just one thing to point out. In Mashiri, the court in Mashiri looked at a variety of things. They looked at the statements of friends in other parts of Germany saying that they were anti-foreigner violence, but the court also looked at the fact that a move would be difficult because they would have to wait years for a new apartment. I mean, again, these are all a part of the things that go into relocating and moving that, you know, were just not considered by the Board. Okay. I think we understand. Yeah. Okay. So I think that will go there. Thank you very much. All right. Thank you. The argument in the matter just argued will be submitted. We'll mix your argument into proof.
judges: Rymer, Wardlaw, Smith